# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SIERRA COOPER, | * |
| *Plaintiff,* | * |
| v. | *    Civil Action No. RDB-24-2120 |
| I.Q. DATA INTERNATIONAL, INC., | * |
| *Defendant.* | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Sierra Cooper ("Plaintiff" or "Ms. Cooper") alleges that Defendant debt collection agency I.Q. Data International, Inc. ("Defendant" or "I.Q. Data") violated state and federal statutes by attempting to collect her debt of unpaid rent. *See generally* (ECF No. 6). Between February 2021 and June 2023, Ms. Cooper lived in a residential property owned by non-party Hudson Homes Management, LLC ("Hudson Homes") in Baltimore, Maryland. She failed to fully pay her rent and, in May 2023, the District Court for Baltimore City, Maryland entered a consent judgment for possession in favor of Hudson Homes. Ms. Cooper asserts that this judgment reduced the amount owed to $8,221.93 because Hudson Homes could not collect rent accrued while it was not licensed as required under Baltimore City ordinance. (*Id.* ¶¶ 8–23.) She moved out of the property in June 2023 without paying any portion of the rent owed. (*Id.* ¶ 13.) Hudson Homes then retained I.Q. Data to collect all unpaid rent, including interest, accrued between February 2021 and June 2023. Ms. Cooper alleges that I.Q. Data inaccurately reported to consumer reporting agencies that she owed

1

Hudson Homes $47,575.00, which damaged her credit score, resulted in the denial of a loan she sought in May 2024, and caused her emotional distress. (*Id.* ¶¶ 22–24.)

On July 23, 2024, Ms. Cooper initiated this action by filing in this Court a four-Count Complaint against I.Q. Data. (ECF No. 1). On October 2, 2024, she filed the operative Amended Complaint (ECF No. 6), alleging that I.Q. Data's debt collection efforts violated (1) the Maryland Consumer Debt Collection Act ("MCDCA"), MD. CODE ANN., COM. LAW § 14-201 *et seq.* (Count I); (2) the Maryland Consumer Protection Act ("MCPA"), MD. CODE ANN., COM. LAW § 13-101 *et seq.* (Count II); (3) the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(a), (b) based on failure to investigate (Count III); and (4) the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e(2)(A) (Count IV).[1] This Court denied Defendant's Motion to Dismiss, *see* (ECF Nos. 10, 11), and the case proceed through discovery, *see* (ECF No. 30). I.Q. Data has filed a Motion for Summary Judgment (ECF No. 35) ("Defendant's Motion"), and Ms. Cooper has filed a Cross-Motion for Summary Judgment Regarding Liability (ECF No. 36) ("Plaintiff's Cross-Motion"). I.Q. Data has responded in Opposition (ECF No. 37), and Plaintiff has replied (ECF No. 38). On June 2, 2026, this Court heard arguments from both parties. As explained on the record and expounded below, Defendant's Motion for Summary Judgment (ECF No. 35) is GRANTED. Plaintiff's Cross-Motion for Summary Judgment (ECF No. 36) is DENIED.

---

[1] This Court has federal question jurisdiction of the federal statutory claims in Counts III and IV, *see* 28 U.S.C. § 1331, and supplemental jurisdiction of the state statutory claims in Counts I and II, *see id.* § 1367.

## BACKGROUND

Ms. Cooper's claims against I.Q. Data arise from her dispute with her former landlord, non-party Hudson Homes Management, LLC ("Hudson Homes"), as to rent payments. Accordingly, the Court briefly recounts the landlord-tenant relationship between Ms. Cooper and Hudson Homes. As clarified at the hearing of June 2, 2026, the facts as to Ms. Cooper's rental relationship with Hudson Homes, the subsequent summary ejectment proceeding,[2] I.Q. Data's collection efforts, and Ms. Cooper's credit are largely undisputed.[3]

### I.    Landlord-tenant relationship between Ms. Cooper and Hudson Homes

On February 4, 2021, Ms. Cooper and Hudson Homes executed a lease agreement under which Ms. Cooper rented a property at 4311 Eldone Road, Baltimore, Maryland 21229, for an initial term of February 17, 2021, until February 16, 2022. (ECF No. 35-3 at 2; ECF No. 35-2 at 9–10.) Ms. Cooper asserts that property was not licensed in the manner required under Baltimore City ordinance until October 12, 2022. (ECF No. 36-5 at 2; *see* ECF No. 35-6 *SEALED* at 40 (showing property was not licensed with Baltimore City Department of Housing and Community Development as of June 17, 2022, and had no previous license on record)).[4] On May 5, 2023, Hudson Homes filed in the District Court for Baltimore City, Maryland, a summary ejectment action against Ms. Cooper. (ECF No. 35-4.) In its complaint, Hudson Homes represented that it was licensed as a landlord and listed its license number.

---

[2] Summary ejectment proceedings offer an expedited process by which a landlord may obtain a money judgment for rent and/or a judgment for possession of the premises against a tenant who has failed to pay rent. *See Assanah-Carroll*, 281 A.3d 72, 93 (Md. 2022).

[3] On the record, the parties noted a dispute as to whether Hudson Homes failed to license the property.

[4] I.Q. Data disputes this assertion and argues that Ms. Cooper's proffered evidence as to the property's licensure "is unsigned . . . uncertified and unauthenticated." (ECF No. 37 at 4.) Thus, I.Q. Data asserts that there is no evidence as to the property's licensure in the record before this Court.

(*Id.* at 7.)  Hudson Homes alleged that Ms. Cooper owed $27,973.44 in unpaid rent for the period between March 2021 and February 2023.  (*Id.*)

On May 26, 2023, the District Court for Baltimore City, Maryland, entered a consent judgment for possession in favor of Hudson Homes in the amount of $8,221.93 but stayed execution of that judgment until June 9, 2023.  *See* (*id.* (consent judgment with checkbox marked that it is a "[j]udgment in favor of landlord for possession of the premises and costs" and checkbox for money judgment and associated amount left blank)).  During a brief hearing, the parties stated that they had reached "an agreement for consent judgment with a two-week stay on the execution of the writ," and the Court entered "judgment in favor of the landlord for possession, for rent, due and unpaid in the amount of $8,221.93 by consent" with "[e]xecution . . . stayed until June 9th."  (ECF No. 35-5 at 4–5.)  At her deposition in this case, Ms. Cooper testified that during this "court process the judge . . . noted that the rental property was not licensed and that the company could not collect on rent for months that they did not have a rental license."  (ECF No. 35-2 at 15.)  Neither the transcript of the hearing of May 26, 2023, nor the consent judgment contain any determination as to licensure.  *See* (ECF No. 35-4 at 7; ECF No. 35-5).

Ms. Cooper testified during her deposition in this case that the judgment included a right to redemption by which she would not be evicted if she produced the unpaid rent.  (ECF No. 35-2 at 12.)  Ms. Cooper received rental assistance in the amount of $8,850.00.  (ECF No. 35-6 *SEALED* at 41.)  She testified that she attempted to make a payment, but "the rental system company" "decided that [it] no longer wanted to take the payment."  (*Id.*)  As a result,

she never made a payment to Hudson Homes for any portion of the debt amount owed.[5]  (*Id.* at 13.)  Additionally, she stated that she failed to pay rent to Hudson Homes for a substantial period due to habitability issues, but she believed the actual amount owed was approximately $3,000.  (*Id.* at 11, 19.)  Ms. Cooper testified that she physically moved away from the home in June 2023.  (*Id.* at 12.)  A Warrant of Restitution – Return of Service was filed in the summary ejectment case on June 22, 2023.  (ECF No. 35-4 at 3.)

## II.    I.Q. Data's attempts to collect unpaid rent from Ms. Cooper

### A.  Initial collection efforts

On November 21, 2023, Hudson Homes authorized Defendant I.Q. Data to collect the unpaid rent balance from Ms. Cooper.  (ECF No. 35-6 *SEALED* ¶ 6.)  At that time, Hudson Homes provided a Security Deposit Disposition Form, (ECF No. 35-6 Ex. A *SEALED* at 8–10), and Resident Ledger, (*id.* *SEALED* at 11–20), reflecting that Ms. Cooper owed a principal balance of $46,423.30.  (ECF No. 35-6 *SEALED* ¶¶ 7, 8.)  Hudson Homes also provided a copy of Ms. Cooper's Lease Agreement.  (ECF No. 35-6 *SEALED* ¶ 9.)  On November 22, 2023, I.Q. Data sent Ms. Cooper a notice stating that it sought to collect a debt she owe to Hudson Homes.  (ECF No. 35-6 Ex. B *SEALED* at 24.)  The notice stated that, as of August 15, 2023, Ms. Cooper owed $46,423.30, but, with interest, she owed $47,178.79 as of November 22, 2023.  (*Id.* *SEALED*.)

On December 6, 2023, I.Q. Data called Ms. Cooper regarding the alleged debt that she owed to Hudson Homes.  (ECF No. 35-6 *SEALED* ¶ 12; ECF No. 35-6 Ex. C *SEALED*

---

[5]  As clarified on the record, Ms. Cooper made some payment toward her rent, including a payment of $4,950 on May 16, 2022, but the $47,575.00 rent debt at issue in this case accounts for that payment.

at 27.)  During this call, Ms. Cooper stated that she "should not have a balance with Hudson Homes" and the I.Q. Data representative responded that Hudson Homes sent I.Q. Data a balance of approximately $47,000.  (ECF No. 35-6 Ex. C *SEALED* at 27.)  Ms. Cooper then explained that she did not owe that balance because she received a judgment and the judge at that time stated that the lease was not valid because Hudson Homes was not a licensed landlord for a portion of the period in which it charged her rent.  (*Id.* *SEALED*.)  I.Q. Data's representative told Ms. Cooper that the court only determined possession such that she still owed the full balance to Hudson Homes.  (*Id.* *SEALED* at 27–28.)  After Ms. Cooper responded that she did not owe the balance, the representative stated that she would mark Ms. Cooper's refusal to pay and "put it on top of [Ms. Cooper's] credit report."  (*Id.* *SEALED* at 28.)  The call then concluded.  (*Id.* *SEALED*.)  Ms. Cooper called I.Q. Data back several times the same day to explain that Hudson Homes was not entitled to collect rent for the period in which it was not licensed as a landlord.  (*Id.* *SEALED*.)  The following day, in response to Ms. Cooper's request, I.Q. Data queued a letter validating the debt, (ECF No. 35-6 Ex. B *SEALED* at 23), which it mailed to Ms. Cooper on December 21, 2023, together with copies of supporting documents.  (ECF No. 35-6 *SEALED* ¶ 14.)

**B. I.Q. Data's reports of debt to TransUnion, Equifax, and Experian**

On January 7, 2024, I.Q. Data began reporting the debt to the consumer reporting agencies TransUnion, Equifax, and Experian as disputed.  (ECF No. 35-6 *SEALED* ¶ 15.)  On January 11, 2024, Ms. Cooper called I.Q. Data and requested that it send proof of the balance to her new address.  (ECF No. 35-6 *SEALED* ¶ 16; ECF No. 35-6 Ex. C *SEALED* at 35.)  The same day, I.Q. Data queued a letter validating the debt, and that letter

was mailed to Ms. Cooper's new address on February 2, 2024.  (ECF No. 35-6 *SEALED* ¶ 18; ECF No. 35-6 Ex. B *SEALED* at 22.)  The January 11, 2024, call was the last telephone conversation between I.Q. Data and Ms. Cooper.  (ECF No. 35-6 *SEALED* ¶ 17.)

On March 22, 2024, Ms. Cooper sent TransUnion, Equifax, and Experian identical letters disputing the $47,575 debt.  (ECF No. 35-6 Ex. D *SEALED* at 38.)  The dispute letters stated that (1) Hudson Homes previously admitted in court that it was not a licensed landlord and, "[u]nder Article 13 Section 5-4 of the Baltimore City Code, a landlord renting an unlicensed property is not allowed to collect or retain any rent"; and (2) "[u]nder the *Assanah-Carroll* case, Hudson Homes is not allowed to pursue rent from while they were unlicensed . . . ."  (*Id.* *SEALED* at 38 (TransUnion), 44 (Experian).)  She also explained that the district court judgment had reduced the amount owed to $8,221.93.  (*Id.* *SEALED*.)  She attached to the dispute letters copies of (1) the district court judgment, (2) a Baltimore City Rental Licensing Verification Request; and (3) a Statement reflecting rent assistance in the amount of $8,850.00.  (*Id.* *SEALED* at 39–41, 45–47.)  The Baltimore City Rental Licensing Verification Request was dated June 17, 2022, and reflected that the Baltimore City Department of Housing and Community Development "has no record of a rental license under Art. 13 subtitle 5 for th[e] property" at 4311 Eldone Road, Baltimore, MD 21229.  (*Id.* *SEALED* at 40, 46.)  It did not include a signature.  (*Id.* *SEALED*.)

### C.  I.Q. Data's investigation of disputed debt

I.Q. Data states that it did not receive any disputes directly from Ms. Cooper, but the consumer reporting agencies forwarded I.Q. Data copies of the dispute materials Ms. Cooper provided to them. (ECF No. 35-6 *SEALED* ¶¶ 20, 21.)  It states that its "policy and

procedure is to timely and reasonably investigate all CRA consumer disputes," timely respond to CRA consumer disputes, and "ensure accuracy of all credit reporting by updating or deleting reporting when warranted and appropriate." (*Id.* *SEALED* ¶ 33.)  It requires that clients only send to collection debts that are accurate and owed, and that clients notify it immediately if they learn that a debt is inaccurate. (*Id.* *SEALED* ¶ 35.)  Additionally, it requires its clients to notify it if a consumer has made a payment or if the client or property receives any information that affects whether the debt is accurate and owed. (*Id.* *SEALED* ¶ 34.)  I.Q. Data avers that it regularly and continuously trains its employees as to these policies. (*Id.* *SEALED* ¶ 36.)

Upon receiving the dispute information Ms. Cooper had provided to the consumer reporting agencies, I.Q. Data investigated the debt.  On April 2, 2024, it emailed Hudson Homes, stating that "[t]he consumer has provided information the account was closed in court, can you please confirm the balance is still due and provide any court documents pertaining to this account so we may validate the balance . . . ." (*Id.* *SEALED* ¶ 23; ECF No. 35-6 Ex. E *SEALED* at 52.)  Specifically, I.Q. Data stated in the email that it was missing court documents and a full ledger. (ECF No. 35-6 Ex. E *SEALED* at 52.)  The same day, an Assistant Portfolio Manager at Hudson Homes responded via email and stated: "The matter was not settled in court.  The tenant was evicted because she did not pay and owes the amount stated." (*Id.* *SEALED* at 51.)  Attached to this response was a resident ledger, but no court documents. *See* (ECF No. 35-6 Ex. F *SEALED*; ECF No. 35-6 *SEALED* ¶¶ 26–27).  At some point, Hudson Homes sent I.Q. Data a Writ of Possession

Request, (ECF No. 35-6 Ex. G *SEALED* at 74), and a Notice of Eviction showing that the Sheriff was scheduled to evict Ms. Cooper on August 15, 2023 (*id.* *SEALED* at 66).

Hudson Homes never informed I.Q. Data that the balance at issue "is not accurate for any reason whatsoever." (ECF No. 35-6 *SEALED* ¶ 28.) I.Q. Data reviewed all documents and written communications from Ms. Cooper, all documentation from Hudson Homes, and its Work Card notes, which reflected all calls with Ms. Cooper and all activity on her account. (*Id.* *SEALED* ¶ 30.) Based on this review, it concluded that Ms. Cooper owed the balance because "she did not provide supporting documents to sufficiently demonstrate that the debt was not due at all, or that the amount reported was inaccurate, or that she had paid the alleged settlement amount, or that she had paid any amount, or that she was not liable for some other reason." (*Id.* *SEALED* ¶ 31.) It concluded that it lacked sufficient information to change its determination that the balance was accurate, and it continued to report the debt as disputed. (*Id.* *SEALED* ¶ 32.) I.Q. Data avers that it did "not intentionally or knowingly report inaccurate information or intentionally or knowingly violate the law." (*Id.* *SEALED* ¶ 37.)

### D. Ms. Cooper's credit and emotional distress

Ms. Cooper alleges that I.Q. Data's credit reporting activity caused a "deterioration in [her] credit standing and creditworthiness . . . ." (ECF No. 35-2 at 23, 20.) Ms. Cooper's Experian credit report lists 66 accounts. (ECF No. 35-8 at 4 ¶ 12.) Her credit report reflects the balance reported by I.Q. Data, (*id.* at 10), $63,713 owed to the Department of Education, and $64,720 owed to Ally Financial, (*id.* at 7–8). At her deposition, Ms. Cooper stated that her credit score dropped by 50 or 60 points after the debt was reported, but she has not produced any documentation of such a decrease. (ECF No. 35-2 at 24.)

9

The debt at issue was reported to at least one potential creditor, Affirm, Inc. ("Affirm"),[6] which declined to prequalify her for credit in May 2024 based on "the amount of [her] outstanding external debt." (ECF No. 36-11 at 2.) Ms. Cooper has applied for credit with Affirm more than ten times. (ECF No. 35-2 at 21.) Affirm declined to extend credit to her on June 19, 2022, and December 15, 2022, (ECF No. 35-8 at 4 ¶ 10), but approved her for loans on December 26, 2023; February 1, 2024; October 3, 2024; December 5, 2024; and December 24, 2024, (*id.* at 4 ¶ 13).

Ms. Cooper states that she has suffered "emotional distress . . . as a result of being pursued for this massive and false debt and from having this false information remain on [her] credit reports even after [she] provided Defendant with everything Defendant would need to know" to determine the reporting was inaccurate. (ECF No. 36-2 at 2 ¶ 9.) At her deposition, she explained that she is "definitely very anxious" and has "experienced a tremendous emotional distress" and "uncertainty . . . just about the day-to-day," including living arrangements and worry as to a denial whenever she needs to use her credit. (ECF No. 35-2 at 29.) She has not seen a medical professional regarding her anxiety, and she is not taking any medication in relation to such anxiety. (*Id.*)

### III.    Procedural History

On July 23, 2024, Ms. Cooper initiated this action by filing in this Court a four-Count Complaint (ECF No. 1) against I.Q. Data. On October 2, 2024, she filed the operative Amended Complaint (ECF No. 6) alleging against I.Q. Data: (1) violation of the Maryland

---

[6] As Ms. Cooper explained in her deposition testimony, Affirm is "[s]imilar to a credit card." (ECF No. 35-2 at 21.) Applicants apply for credit in an amount of their choosing, Affirm performs a credit check, and it then approves or denies the requested loan accordingly. (*Id.*)

Consumer Debt Collection Act ("MCDCA"), MD. CODE ANN., COM. LAW § 14-201 *et seq.* (Count I); (2) violation of the Maryland Consumer Protection Act ("MCPA"), MD. CODE ANN., COM. LAW § 13-301 *et seq.* (Count II); (3) violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(a), (b), based on failure to investigate (Count III); and (4) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e(2)(A) (Count IV).  At a hearing on June 2, 2026, this Court heard oral argument from both parties as to (1) Defendant's Motion for Summary Judgment (ECF No. 35) ("Defendant's Motion") and (2) Plaintiff's Cross-Motion for Summary Judgment as to Liability and Opposition to Defendant's Motion (ECF No. 36) ("Plaintiff's Cross-Motion").

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a court's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter for resolution at trial.  *Id.* at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514,

11

526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Judd*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *accord Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (citing *Anderson*, 477 U.S. at 249). To survive summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That is, the nonmoving party bears the burden to submit evidence that is "significantly probative" as to a genuine issue of material fact. *Anderson*, 477 U.S. at 249–50. Where, as here, both parties file motions for summary judgment, this Court applies the same standard of review to both motions, considering "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defs. of Wildlife v. North Carolina Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)).

**ANALYSIS**

As explained on the record and expounded below, Defendant's Motion for Summary Judgment (ECF No. 35) is granted as to all counts such that Plaintiff's Cross-Motion (ECF No. 36) must be denied. I.Q. Data argues that Plaintiff lacks Article III standing such that

this Court lacks subject matter jurisdiction over this matter. *See* (ECF No. 35-1 at 12–14). Alternatively, it contends that Ms. Cooper cannot establish the elements of her claims.

### I.    Article III Standing

"As the Supreme Court has consistently emphasized, Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies." *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 619 n.5 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992)). "The requirement that a [p]laintiff possess 'standing to sue' emanates from that constitutional provision." *Id.* The burden to establish standing lies with the party invoking federal jurisdiction—here, Ms. Cooper. *Lujan*, 504 U.S. at 561. "[S]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing for each claim [she] seeks to press and for each form of relief that is sought."[7] *Carolina Youth Action Proj. v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023) (quoting *Town of Chester v. Laroe Ests.*, 581 U.S. 433, 439 (2017)).

"A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of litigation.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Lujan*, 504 U.S. at 561). At the summary judgment stage, a plaintiff "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts, which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (internal citation omitted) (quoting FED. R. CIV. P. 56(e)); *see Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 295 (4th Cir. 2024). That is, a plaintiff must set forth evidence

---

[7] Ms. Cooper's state-law claims in this case incorporate her federal claim under the FDCPA such that, if she has standing under that claim, she also has standing for her state law claims.

that, taken as true, establishes that she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Although Defendant challenges Ms. Cooper's ability to establish a concrete injury traceable to its conduct, as explained on the record and below, Ms. Cooper has established standing at this summary judgment stage.

"A plaintiff can show an 'injury in fact' when . . . she suffers 'an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent.'" *Piney Run Preservation Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 263 (4th Cir. 2001) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000)). "Crucially, concreteness and particularization are distinct requirements for injury-in-fact; the former is 'quite different' from the latter." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 340). An injury is concrete "if it 'actually exist[s].'" *Id.* (quoting *Spokeo*, 578 U.S. at 340). Analysis of whether an injury is sufficiently concrete to confer Article III standing depends on whether the injury is tangible or intangible. *TransUnion*, 594 U.S. at 425. As to tangible injuries, the concreteness inquiry is straightforward: "If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *Id.* Intangible injuries, however, involve a more protracted review of whether the harm has "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* (collecting cases). Thus, a statutory violation alone may not always form an injury-in-fact. *Baehr*, 953 F.3d at 252 (citing *Spokeo*, 578 U.S. at 341).

Once a plaintiff has shown a concrete injury, she must also establish that the claimed injury is "fairly traceable to" the defendant's conduct. *Lujan*, 504 U.S. at 560–61. As the U.S. Supreme Court has explained, "the causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (citing *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). Nor does traceability "mean that plaintiffs must show to a scientific certainty that defendant's [conduct] caused the precise harm suffered by the plaintiffs." *Mayor & City Council of Balt. v. Wells Fargo Bank, N.A.*, Civ. No. JFM-08-62, 2011 WL 1557759, at *2 (D. Md. Apr. 22, 2011) (quoting *Gaston Copper Recycling Corp.*, 204 F.3d at 161). Nevertheless, where "'the line of causation . . . is too attenuated' or 'highly indirect,' the plaintiff's injury is not 'fairly traceable' to the defendant and the plaintiff will not have standing." *Id.* (quoting *Allen v. Wright*, 486 U.S. 737, 757 (1984)); *see also Bishop v. Bartlett*, 575 F.3d 419, 425 (4th Cir. 2009) (explaining plaintiff lacks standing if an injury results from a non-party's conduct).

Although Ms. Cooper argues that emotional distress constitutes her "main damages in this case," (ECF No. 36-1 at 16), she also contends that she suffered a concrete injury when Affirm denied her credit after reviewing a consumer report containing the disputed debt. (*Id.* at 18–19.)[8] Although I.Q. Data argues that Ms. Cooper has not established a concrete injury-

---

[8] As explained at the hearing of June 2, 2026, because the Court concludes that the denial of credit is a concrete injury, it does not reach Ms. Cooper's asserted emotional distress. The Court notes, however, that in a prior memorandum opinion in this case, it explained that the Fourth Circuit previously determined that allegations of emotional distress "as a consequence of [a defendant's] alleged violations of the FDCPA's proscribed practices" are sufficient to establish a concrete injury at the pleading stage. *See* (ECF No. 10 at 9–10 (citing *Moore v. Blibaum & Assocs., P.A.*, 693 F. App'x 205, 206 (4th Cir. 2017) (unpublished) and *Ben-Davies v. Blibaum & Assocs., P.A.*, 695 F. App'x 674, 676–77 (4th Cir. 2017) (unpublished))). Approximately three months later, the Fourth Circuit issued *Holmes v. Elephant Insurance Company*, 156 F.4th 413 (4th Cir. 2025), in which it held that emotional distress "do[es] not suffice for standing on [its] own" and may only furnish standing for damages "when incurred in response to a separate imminent harm." *Id.* at 435.

15

in-fact traceable to its conduct, (ECF No. 35-1 at 13–14), it acknowledged on the record that denial of credit may be sufficient to confer Article III standing.  Although the U.S. Court of Appeals for the Fourth Circuit does not yet appear to have addressed whether denial of credit constitutes a tangible harm for standing, most federal courts to have considered the issue have held that denial of credit is a tangible harm that confers standing for FDCPA and FCRA claims. *See Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1206–07 (11th Cir. 2019); *Rydholm v. Equifax Info. Servs., LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022); *Simonson v. IQ Data Int'l, Inc.*, 698 F. Supp. 3d 1055, 1061–62 (W.D. Wisc. 2023); *Sipe v. Equifax Info. Servs., LLC*, Civ. No. 3:16-6103, 2017 WL 253157, at *6 (S.D.W.V. Jan. 20, 2017); *cf. Alston v. Freedom Plus/Cross River*, Civ. No. TDC-17-0033, 2018 WL 770384, at *6 (D. Md. Feb. 7, 2018) (explaining plaintiff lacked standing where she "allege[d] no facts to show that she was denied credit, lost access to credit, or suffered any other economic harm").  *But see Freeman v. Ocwen Loan Servicing, LLC*, 113 F.4th 701, 709–10 (7th Cir. 2024) (holding statement that fourth party denied loan did not show concrete injury at summary judgment).

Consistent with her burden to provide evidence of harm, *see Fernandez*, 116 F.4th at 295, Ms. Cooper has proffered a May 1, 2024, letter from Affirm in which it stated:

> Thank you for your interest in a loan through Affirm issued by Celtic Bank, 268 South State Street, Suite 300 Salt Lake City, UT 84111 USA. Our partner bank can't prequalify you because of the amount of your outstanding external debt[.]

(ECF No. 36-11 at 2.)  She testified that she could not identify another instance of being denied credit based on I.Q. Data's reporting, but the denial of the May 2024 loan was the first

16

time that Affirm stated the reason of "outstanding external debt."[9]  (ECF No. 35-2 at 23.)

Such testimony and evidence are sufficient to establish concrete harm based on denial of credit

traceable to Defendant's conduct in reporting the debt.  *See, e.g.*, *Merchant v. Equifax Info. Servs.,*

*LLC*, 616 F. Supp. 3d 146, 150 (D. Mass. 2022) (holding FCRA plaintiff established standing

at summary judgment by producing broker's affidavit "indicating that Plaintiff was unable to

obtain refinancing for months due to the purported freeze on his Equifax account").[10]

Although the Affirm letter does not overtly reference the disputed rent debt, Ms. Cooper has

testified that "anything that was on [her] credit report before IQ Data reported this was on

there at the time of the other times that [she] applied [for credit with Affirm], and it wasn't a

factor." (ECF No. 35-2 at 23.)  Construing all facts in Ms. Cooper's favor, *see Lujan*, 504 U.S.

at 561, the denial is traceable to I.Q. Data's conduct in reporting the debt.[11]   As stated on the

record, therefore, Ms. Cooper has established standing.

---

[9]  She also testified in her deposition that she is "very fearful to apply for credit," (ECF No. 35-2 at 28), but such "deterrence from accessing the credit market" does not support standing. *Evans v. Am. Collection Enter.*, 624 F. Supp. 3d 593, 600 (D. Md. 2022).

[10]  As discussed on the record, Ms. Cooper may also be able to establish a concrete injury in fact based on reputational harm from the inclusion of the debt on a consumer report disseminated to Affirm. *See* (ECF No. 36-1 at 18–19.)  The Supreme Court in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), held that dissemination of credit reports flagging named consumers as "potential matches" to individuals on a list of "specially designated nationals" who threaten terrorism constituted a concrete injury akin to the common law tort of defamation. *Id.* at 419, 432.  The Fourth Circuit has held that where an injury is purely reputational, federal courts must evaluate the *nature of the disclosure* to determine whether it satisfies the traditional defamation requirement that the party to which the information was disclosed "understand[s] [the publication's] defamatory significance." *Fernandez*, 116 F.4th at 296.  Regardless of reputational harm, however, denial of credit alone is sufficient to confer standing.

[11]  Although I.Q. Data notes that Affirm subsequently approved Ms. Cooper for two loans in February 2024 and October 2024, both periods in which the amount of outstanding external debt reflected the disputed rent debt at issue, consideration of such denials would involve drawing inferences *against* Ms. Cooper as to traceability, which is not permissible at summary judgment.

## II. Legal issues as to rent debt

Undergirding the parties' arguments for summary judgment are threshold legal disputes as to whether an unlicensed landlord may use debt collection practices other than litigation to collect rent accrued while a property was unlicensed and the legal effect of the consent judgment issued in May 2023. Before reaching the parties' arguments as to the merits, therefore, this Court evaluates the legal inquiries as to (1) the existence of the debt; (2) the accuracy of the amount of the debt; and (3) the collectability of the debt.

### A. Existence of rent debt

As Maryland's highest court recently confirmed in *Assanah-Carroll v. Law Offices of Edward J. Maher, P.C.*, 281 A.3d 72 (Md. 2022),[12] a landlord in Maryland may not initiate "a summary ejectment proceeding to collect unpaid rent where the landlord lacks a rental license."[13] *Id.* at 94. Accordingly, this Court and Maryland courts generally have held that a landlord cannot enforce a tenant's obligation to pay rent accrued while a property was not licensed. *See Aleti v. Metro. Balt., LLC*, 279 A.3d 905, 931 (Md. 2022); *Blizzard v. Hunter Warfield, Inc.*, Civ. No. ABA-23-3374, 2026 WL 274616, at *6 (D. Md. Feb. 3, 2026); *Hall v. Heather Hill Property Co., LLC*, Civ. No. ABA-25-0238, 2026 WL 279112, at *5 (D. Md. Feb. 3, 2026); *Zambali v. Shulman Rogers, P.A.*, Civ. No. SAG-23-3194, 2024 WL 3161590, at *5 (D. Md. June 25, 2024). As Judge Gallagher of this Court has explained, however, a tenant's "debt d[oes] not disappear simply because his landlord did not have a license . . . The landlord simply could

---

[12] As noted on the record, the *Assanah-Carroll* case addressed two questions certified to the Supreme Court of Maryland by Judge Blake of this Court. 281 A.3d at 75–76.

[13] To the extent that Hudson Homes—the original creditor—did not have the right to collect rent for a period in which it was unlicensed, I.Q. Data also would not have a right to collect such debt. *See, e.g.*, *Chavis v. Blibaum & Assocs., P.A.*, 264 A.3d 1254, 1269 (Md. 2021) (explaining a plaintiff may have a claim under MDCA where debt collector claims amount that it knows it lacks the right to collect).

not collect the debt using the judicial process." *Zambali*, 2024 WL 3161590, at *6. It is undisputed that Ms. Cooper has not paid the $47,575 in rent at issue. Thus, regardless of whether Hudson Homes was unlicensed and could not *enforce* her obligation to pay rent, she still owes rent.

### B. Accuracy of amount of rent debt

As set forth on the record, the consent judgment issued by the District Court for Baltimore City, Maryland, on May 26, 2023, was a judgment for possession. In issuing that judgment, the district court stated on the record that it was "entering judgment in favor of the landlord for possession, for rent, due and unpaid in the amount of $8,221.93 by consent . . . Execution will be stayed until June 9th." (ECF No. 35-5 at 4–5.) This consent judgment is governed by § 8-401 of Maryland's Real Property Article, which controls summary ejectment proceedings and allows a landlord to seek either or both of two distinct remedies: (1) a judgment for possession; and (2) a money judgment for rent. To obtain a money judgment for rent, the landlord must request such "a judgment for the amount of rent due, costs, and any late fees . . ." in addition to requesting to repossess the premises. MD. CODE ANN., REAL PROP. § 8-401(b)(1)(iv); *see Brown v. Housing Opportunities Com'n of Montgomery Cnty.*, 714 A.2d 197, 200 & n.1 (Md. 1998) (explaining § 8-401 "permits a landlord to recover possession of leased premises" and separately noting "court may also enter a money judgment for the rent due").

A judgment for possession authorizes a landlord to begin the process to evict the tenant and reclaim possession of the premises. MD. CODE ANN., REAL PROP. § 8-401(f)(1). The Supreme Court of Maryland very recently explained that, under § 8-401, the district court at a

summary ejectment proceeding for possession is required to determine the precise amount of unpaid rent due. *Kapneck 14-16, LLC v. Bkeezy's Speakeasy, LLC*, -- A.3d --, 2026 WL 1158049, at *14 (Md. 2026). Generally, where the district court has issued a judgment of possession in favor of the landlord, the tenant has a "right to redemption of the leased premises" if she "tenders to the landlord the amount of the judgment, as well as any court-awarded costs and fees, before the execution of the judgment." *Pettiford v. Next Gen. Tr. Serv.*, 226 A.3d 15, 33 (Md. 2020) (quoting *Cane v. EZ Rentals*, 149 A.3d 649, 652 (Md. 2016)). Thus, the statutory requirement that the court determine the amount of rent due and owing in part notifies the tenant of the amount of money she must pay to avoid eviction. As distinct from a judgment for possession, a monetary judgment for rent is an enforceable civil judgment. It authorizes "a judgment creditor to obtain possession of the assets of a judgment debtor in order to satisfy the debt or damages recovered by the judgment." *Rentals Unlimited, Inc. v. Adm'r, Motor Vehicle Admin.*, 405 A.2d 744, 751 (Md. 1979).

The record in this case reflects that the consent judgment is a judgment for possession—but not a money judgment—in favor of Hudson Homes. *See* (ECF No. 35-4 at 7 (consent judgment with checkbox marked that it is a "[j]udgment in favor of landlord for possession of the premises and costs" and checkbox for money judgment and associated amount left blank)); (ECF No. 35-5 at 4–5 (transcript of summary ejectment proceeding in which district court stated it was "entering judgment in favor of the landlord for possession, for rent, due and unpaid in the amount of $8,221.93 by consent . . . ")).[14] Consistent with the

---

[14] The record further reflects that Hudson Homes requested a judgment for possession and not a money judgment because, as Plaintiff's counsel noted on the record, it effectuated service only by affixing notice of intent to the door of the property, (ECF No. 35-4 at 6–7), but a money judgment requires personal service.

requirements of Maryland's Real Property Article § 8-401, *Kapneck 14-16*, -- A.3d --, 2026 WL 1158049, at \*14, the district court determined that Ms. Cooper owed $8,221.93. As a judgment for possession only, however, the consent judgment is not conclusively determinative of the amount of rent owed. Ms. Cooper testified that the district court explained that Hudson Homes could not collect rent accrued while it was unlicensed, (ECF No. 35-2 at 17–18). However, this determination appears neither in the transcript of the proceeding nor in the judgment. *See* (ECF No. 35-4 at 7; ECF No. 35-5 (making no mention as to Hudson Homes' licensure)). Thus, neither the judgment for possession nor the asserted lack of licensure alter the undisputed fact that Ms. Cooper failed to pay rent in the total amount—including interest—of $47,575.00. That is, the debt at issue is *accurate*.[15]

## C. Enforceability of rent debt

Although I.Q. Data reported an *accurate* amount of debt, the *enforceability* via collections proceedings of a rent debt accrued while a property is unlicensed presents a more nuanced question.[16] In *Assanah-Carroll*, Maryland's highest court determined that landlords cannot use summary ejectment proceedings to collect rent for a period in which they were unlicensed. 281 A.3d at 100. It also appeared to hold that landlords cannot use lesser collection activities to collect such rent.[17] *See id.* at 100–101. As this Court has recognized, however, *Assanah-*

---

[15] Although Plaintiff raises several arguments as to the preclusive effect of a consent judgment generally, *see, e.g.* (ECF No. 36-1 at 19–21), the critical issue in this case is not whether the judgment was a consent judgment but rather that it was a judgment for possession, as distinct from a money judgment for rent. As Plaintiff argues, a "consent judgment memorializes the agreement of the parties, pursuant to which they have relinquished the right to litigate the controversy in exchange for a certain outcome . . .," *Pettiford*, 226 A.3d at 26 (quoting *Long v. Maryland*, 807 A.2d 1, 7 (Md. 2002)). A judgment for possession, however, does not determine all rent owed as would a money judgment for rent.

[16] As relevant to Ms. Cooper's case, Article 13 § 5-4 of the Baltimore City Code requires landlords to be licensed to collect rental payments. As noted above, Defendant disputes whether Hudson Homes was unlicensed.

[17] In pertinent part, Maryland's highest court held:

*Carroll* "did not expressly define what constitutes 'unlawful collection activity' in the context of" an unlicensed landlord. *Hall*, 2026 WL 279112, at *4. The parties have identified no cases in which a tenant alleges violation of the MCDCA and MCPA based on debt collection activities after a landlord received a judgment for possession.

This Court has recently considered *Assanah-Carroll* in similar circumstances. In *Zambali v. Shulman Rogers, P.A.*, 2024 WL 3161590 (D. Md. June 25, 2024), Judge Gallagher of this Court determined that a tenant could not establish a cognizable injury where he admitted that he did not pay rent to an unlicensed landlord who then hired a firm to sue for the unpaid rent. This Court construed Maryland law to prohibit an unlicensed landlord from using "Maryland courts to collect [a rental debt]" but held that the tenant's "rent could be charged" and his debt still existed. *Id.* at *6. Relatedly, in *Blizzard v. Hunter Warfield, Inc.*, 2026 WL 274616 (D. Md. Feb. 3, 2026), Judge Ableson of this Court explained that "[a] landlord is prohibited from engaging in . . . lesser collection activities for periods where the property was unlicensed, but these activities do not give rise to a private right of action under the MCDCA or the MCPA." *Id.* at *5; *see also Hall*, 2026 WL 279112, at *6 (dismissing in part MCDCA claim because rent payments were voluntary unless made under court order). These cases suggest that unlicensed

---

Where a municipality or county enacts a rental license law, which conditions the performance of a residential lease upon the issuance of a rental license, and a landlord fails to possess a valid license for a period of a tenant's occupancy, *a landlord may not utilize the courts, whether through a common law breach of contract action, or a statutory action arising under Title 8 of the Real Property Article to recover unpaid rent that is attributable to the unlicensed period . . . .*

E. *Given our holding that a landlord may not engage in debt collection activities or pursue claims against a tenant who has failed to pay rent attributable to a period during which the landlord was unlicensed*, a tenant may have a right of action under the MCDCA and the MCPA where the landlord engages in such activity, and the tenant can establish that the unlawful conduct caused damages.

*Assanah-Carroll*, 281 A.3d at 100–01 (emphasis added).

22

landlords cannot refer unpaid rent to collections, but payment of rent to an unlicensed landlord based on collection activities cannot establish damages under the MCDCA or MCPA. In this case, however, Ms. Cooper's damages are not based on any payment of rent—it is undisputed that she has not paid the rent at issue—but upon Affirm's denial of a loan in May 2024 after I.Q. Data reported the debt.  With this legal backdrop in mind, the Court addresses Ms. Cooper's claims in turn, beginning with her federal claims.

### III.     Count III: Violation of the federal Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(a), (b)

In Count III, Ms. Cooper alleges that I.Q. Data violated the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(a), (b), by willfully or negligently failing to conduct a reasonable investigation of her dispute and continuing to report an inaccurate rent delinquency on her credit reports.  Specifically, she alleges that I.Q. Data violated FCRA § 1681s-2(a), (b), by either willfully or negligently: (1) failing to conduct an investigation of the information that she disputed; (2) failing to report the results of the investigation to the credit reporting agencies; (3) failing to report an accurate status of the inaccurate information to the credit reporting agencies; (4) failing to properly participate, investigate, and comply with the reinvestigations conducted by the consumer reporting agencies; (5) continuing to furnish and disseminate inaccurate and derogatory credit, account and other information to the credit reporting agencies; and (6) failing to comply with requirements imposed upon furnishers of information under the FCRA.  *See* (ECF No. 6 ¶¶ 40–49).  Even accepting, *arguendo*, Ms. Cooper's assertion that Hudson Homes was not licensed until October 12, 2022, she cannot establish her FCRA claim.

Under the FCRA, furnishers of information to a consumer reporting agency have an obligation "to ensure that the information they provide . . . is accurate." *Roberts v. Carter-Young, Inc.*, 131 F.4th 241, 245 (4th Cir. 2025) (citing 15 U.S.C. § 1681s-2(a)). The Fourth Circuit has held that a successful FCRA claim requires a consumer to identify "facts that, if true, indicate an inaccuracy or incompleteness in their credit report that is objectively and readily verifiable." *Id.* at 253. Whether information is "objectively and readily verifiable" depends on the facts of each case. *Id.* at 251. Furnishers "have neither the resources nor the expertise to conduct the level of investigation that takes place in judicial proceedings or to make the kinds of determinations about disputes that courts make." *Id.* As a result, "a dispute that involves complex fact-gathering and in-depth legal analysis of the sort that courts would typically perform is not objectively and readily verifiable." *Id.*

In this case, as explained on the record, the parties' dispute as to the collectability of the debt involves a complex legal inquiry—whether rent accrued while the property was unlicensed is collectible via debt collection—that is not readily verifiable.[18] As explained above, there exists some ambiguity in the Supreme Court of Maryland's holding in *Assanah-Carroll. See, e.g. Hall*, 2026 WL 279112, at *4. In cases addressing disputes as to rent payments to unlicensed landlords, this Court has held that the rent debt still accrues, *see, e.g.*, *Zambali*, 2024 WL 3161590, and an unlicensed landlords' use of lesser debt collection activities is not always actionable, *Blizzard*, 2026 WL 274616, at *5. Thus, as explained on the record, the debt reported in this case was accurate. To the extent the debt was not fully enforceable, there exist

---

[18] I.Q. Data argues that *Assanah-Carroll* prohibited only use of the courts to collect rent accrued during a period in which a property was not licensed. *See* (ECF No. 35-1 at 15). Thus, it contends that an unlicensed landlord— and, therefore, its debt collector—may use debt collection tactics to collect rent.

"unresolved legal disputes [that] 'render [the] claim non-cognizable under the FCRA.'" *Harvey v. USAA Fed. Savings Bank*, No. 3:25cv155(RCY), 2026 WL 988508, at *6 (E.D. Va. Apr. 13, 2026) (quoting *Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 270 (2d Cir. 2023)).[19]

### IV.   Count IV: Violation of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(2)(A)

For similar reasons, I.Q. Data is also entitled to summary judgment as to Ms. Cooper's claim under the Fair Debt Collection Practices Act ("FDCPA") in Count IV. Section 1692e(2)(A) of the FDCPA prohibits a debt collector from "making false representations as to a debt's character, amount, or legal status." *Webster v. ACB Receivables Mgmt., Inc.*, 15 F. Supp. 3d 619, 625 (D. Md. 2014) (citing 15 U.S.C. § 1692e(2)(A)). "To prevail in a private action, the plaintiff must prove that '[she] has been the object of collection activity arising from consumer debt, (2) the defendant is a debt [ ] collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA.'" *Id.* (quoting *Stewart v. Bierman*, 859 F. Supp. 2d 754, 759–60 (D. Md. 2012)). The FDCPA does not consider the debt collector's intent. *See Yu v. Kevin B. Wilson L. Offs.*, 919 F. Supp. 2d 661, 664 (D. Md. 2013). As acknowledged on the record, the parties dispute the third element of Ms. Cooper's FDCPA claim: whether I.Q. Data has falsely represented the character, amount, or legal status of the debt in violation of § 1692e(2)(A). As to the character or amount of the debt, for the reasons set forth on the record and explained above, the debt reported was accurate.

---

[19] While this Court determined at the pleading stage that Ms. Cooper had sufficiently alleged readily verifiable information, at the summary judgment stage the record makes clear that the parties dispute the collectability of the debt, a legal inquiry of the sort courts—not furnishers—typically make.

Moreover, even assuming, *arguendo*, that the property was unlicensed for some portion of the relevant rental period, the statutory *bona fide* error defense shields I.Q. Data from liability. This defense protects debt collectors from liability under 15 U.S.C. § 1692e(2)(a) where they can establish by a preponderance of the evidence that "the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c); s*ee Long v. McMullen, Drury & Pinder, P.A.*, Civ. No. RDB-10-2776, 2011 WL 4458849, at *5 (D. Md. Sep. 23, 2011) (citing *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 589 (2010)). In other words, the debt collection agency must "demonstrate that its violations were '(1) unintentional, (2) [] bona fide error[s], and (3) made despite the maintenance of procedures reasonably adapted to avoid the error.'" *Webster*, 15 F. Supp. 3d at 626 (quoting *Johnson v. Riddle*, 443 F.3d 723, 727–28 (10th Cir. 2006)). Notably, "[t]he FDCPA does not require a debt collector to engage in an independent investigation of the debt referred for collection." *Long*, 2011 WL 4458849, at *5 (quoting *Sayyed v. Wolpoff & Abramson, LLC*, 733 F. Supp. 2d 635, 646 (D. Md. 2010)). The defense protects debt collectors "provided there is a 'colorable factual basis' for a client's claim." *Grant-Fletcher v. McMullen & Drury, P.A.*, 964 F. Supp. 2d 514, 528 (D. Md. 2013) (collecting cases). For this reason, the debt collector must prove "that it has procedures in place reasonably adapted to avoid the type of error that occurred." *Akalwadi v. Risk Mgmt. Alts., Inc.*, 336 F. Supp. 2d 492, 503–504 (D. Md. 2004); *see Webster*, 15 F. Supp. 3d at 629 (requiring nexus between procedures and type of error).

As the parties acknowledged on the record, there exist no genuine disputes of fact as to I.Q. Data's investigation of the debt. Based on those undisputed facts, no reasonable jury

could determine that I.Q. Data lacked the appropriate procedures to avoid reporting an uncollectible debt.  I.Q. Data had no reason to question the validity of the debt that it initially reported to consumer reporting agencies: Ms. Cooper provided I.Q. Data no documentation regarding Hudson Homes' licensure or the consent judgment, and I.Q. Data was not obligated to independently investigate the debt referred.  *Long*, 2011 WL 4458849, at *5.  Even after I.Q. Data received Ms. Cooper's dispute materials from the consumer reporting agencies, it followed procedures designed to avoid collection of invalid debts.

Specifically, it has identified procedures that "require[] its clients to notify [it] if a debt is not accurate, if there is a payment, or if the client or property receives any information that impacts whether the debt is accurate and owed," and to only send accurate and owed debts for collection.  (ECF No. 35-6 *SEALED* at 5 ¶¶ 34, 35.)  It had a contractual relationship with a third-party entity for quality control, including compliance and procedures such as: (1) referring dispute letters and associated information to the quality department; (2) reviewing the dispute; and (3) requesting verification from the client as to relevant documents and the balance.  (ECF No. 35-7 at 10.)  The deposition of the I.Q. Data consultant who contacted Hudson Homes about Plaintiff's dispute reflects that she was trained with an overview of the American legal system.  (ECF No. 36-10 at 6–7.)  Although Plaintiff emphasizes that the deposition testimony of I.Q. Data's corporate designee reflects that she did not know whether I.Q. Data had procedures to confirm a Maryland landlord's licensure, (*id.* at 22), she defines the relevant procedures too narrowly.  In this case, even assuming the truth of Ms. Cooper's assertion that Hudson Homes was unlicensed such that some of the debt was not collectible, there is a clear nexus between I.Q. Data's debt verification procedures and the error at issue—

reporting a partially uncollectible debt.  I.Q. Data appropriately relied on the documentation, including a full rent ledger and eviction notice, provided by its client.  As set forth on the record, I.Q. Data is entitled to summary judgment as to Count IV.

> **V.  Counts I and II: Violation of Maryland Consumer Debt Collection Act, MD. CODE ANN., COM. LAW § 14-202(3), (8), (11) and Maryland Consumer Practices Act, MD. CODE ANN., COM. LAW §§ 13-303, 13-301(14)(iii)**

In Count I, Ms. Cooper alleges that I.Q. Data violated three provisions of the Maryland Consumer Debt Collection Act ("MCDCA"): (1) Section 14-202(3), which provides that a debt collector "may not . . . [d]isclose or threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false;" (2) Section 14-202(8), which provides that a debt collector "may not . . . [c]laim attempt, or threaten to enforce a right with knowledge that the right does not exist;" and, (3) Section 14-202(11), which bars a debt collector from engaging "in any conduct that violates §§ 804 through 812 of the [FDCPA]."  Ms. Cooper's claim under the Maryland Consumer Protection Act ("MCPA") in Count II is derivative of her claim in Count I.

As an initial matter, Plaintiff acknowledged on the record that her claim under MCDCA § 14-202(11) is wholly dependent on her claim under the FDCPA in Count IV.  As explained on the record and above, she cannot establish that I.Q. Data violated the FDCPA.  Thus, Defendant is entitled to summary judgment as to the claim under MCDCA § 14-202(11).  Furthermore, as set forth on the record and expounded below, Ms. Cooper cannot establish knowledge as to her remaining MCDCA claims in Count I.  Accordingly, I.Q. Data is also entitled to summary judgment as to Count I and Count II.

### A.  Claim under MCDCA § 14-202(3) in Count I

First, as to MCDCA § 14-202(3), Ms. Cooper cannot establish that I.Q. Data "disclose[d] information which affects [her] reputation for credit worthiness *with knowledge that the information is false.*" MD. CODE ANN., COM. LAW § 14-202(3) (emphasis added). As this court has recognized, liability under this provision requires evidence that the defendant "disclosed information with actual knowledge or reckless disregard as to the falsity of the information . . . ." *Akalwadi*, 336 F. Supp. 2d at 511. For the reasons discussed above and on the record, the debt that I.Q. Data reported was accurate. *See, e.g.*, *Zambali*, 2024 WL 3161590, at *6. Thus, Ms. Cooper cannot establish that I.Q. Data reported the debt with the knowledge that it was false.

## B. Claim under MCDCA § 14-202(8) in Count I

MCDCA § 14-202(8) prohibits a debt collector from "[c]laim[ing], attempt[ing], or threaten[ing] to enforce a right *with knowledge that the right does not exist.*" As Maryland's highest court has explained, "a plaintiff may invoke § 14-202(8) when the amount claimed by the debt collector includes sums that the debt collector, to its knowledge, does not have the right to collect." *Chavis v. Blibaum & Assocs., P.A.*, 264 A.3d 1254, 1269 (Md. 2021). Thus, "allegations that a creditor attempted to collect an excessive amount of a charge it was otherwise entitled to collect" may raise a claim under § 14-202(8). *Howes v. SN Servicing Corp.*, Civ. No. CCB-20-670, 2022 WL 4554857, at *3 (D. Md. Sep. 29, 2022).

To show that a defendant acted with "knowledge" under MCDCA, a plaintiff must show the defendant knew it lacked the right to collect the debt or acted with reckless disregard as to the debt's validity. *Ramirez v. LVNV Funding*, Civ. No. ABA-24-2335, 2025 WL 1665388, at *5 (D. Md. June 12, 2025). The knowledge requirement does not necessarily immunize a

defendant for a mistake of law, and "one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Smith v. Olivieri & Assocs., LLC*, Civ. No. GLR-20-2598, 2022 WL 596805, at *9 (D. Md. Feb. 28, 2022) (quoting *Spencer v. Hendersen-Webb, Inc.*, 81 F. Supp. 2d 582, 595 (D. Md. 1999)).  Even so, "where the law is unsettled at the time the collector claims a right . . . to withstand summary judgment and eventually prevail at trial, a plaintiff must produce facts from which the trier of fact reasonably may infer that the defendant acted recklessly in claiming the right." *Chavis*, 264 A.3d at 1273. Under such circumstances, a defendant's recklessness is a question of fact.  *Id.* at 1274.

In this case, Ms. Cooper has produced no "facts from which a trier of fact reasonably may infer" that I.Q. Data acted recklessly.  *Id.* at 1273.  As discussed above and on the record, it is not entirely clear when a debt collector's efforts to enforce a rent debt accrued in part while a property is unlicensed creates a cognizable claim under the MCDCA.  *See, e.g.*, *Assanah-Carroll*, 281 A.3d at 100 (suggesting a tenant *may* have an MCDCA claim against landlord who engaged in collection activities); *Blizzard*, 2026 WL 274616, at *5 (explaining a landlord cannot use lesser collection activities to collect rent accrued while a property was unlicensed, "but these activities do not give rise to a private right of action under the MCDCA or the MCPA"). In this case, even accepting Ms. Cooper's assertion that Hudson Homes did not license the property at Eldone Road, I.Q. Data only received information regarding the licensure issue when it obtained Ms. Cooper's dispute materials in March 2024.  Those disputes for the first time provided copies of an unsigned Baltimore City Licensing Verification Request dated June 17, 2022, that suggested the property was not licensed at that time.

Upon receipt of Ms. Cooper's dispute materials—including her letter to the consumer reporting agencies, a copy of the consent judgment, a copy of the Licensing Verification Request dated June 17, 2022, and a copy of her rent assistance statement—it contacted Hudson Homes to receive a full rent ledger that confirmed the amount of rent owed. *See* (ECF No. 35-6 *SEALED* at 3–4 ¶¶ 19–30). Ms. Cooper has identified no "facts" from which a reasonable juror could conclude that I.Q. Data acted recklessly by accurately reporting the full amount of rent accrued. At most, Ms. Cooper's dispute materials included her own interpretation of the *Assanah-Carroll* case and an assertion that Hudson Homes was not licensed. I.Q. Data investigated Ms. Cooper's dispute fully and confirmed the rent owed with Hudson Homes before continuing to report the data. As explained on the record, I.Q. Data is not obligated to follow Ms. Cooper's legal conclusions about a heavily disputed area of law. The facts show that I.Q. Data legitimately believed that it had the legal right to collect the rent accrued. *Powell v. Palisades Acquisition XVI, LLC*, 782 F.3d 119, 128 (4th Cir. 2014).

## CONCLUSION

For the reasons set forth on the record at the hearing of June 2, 2026, and expounded above, Defendant's Motion for Summary Judgment (ECF No. 35) is GRANTED as to all claims. Accordingly, Plaintiff's Cross-Motion for Summary Judgment (ECF No. 36) must be DENIED.

A separate Order follows.

Date: June 4, 2026

/s/
_____
Richard D. Bennett
United States Senior District Judge

31